**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **Cr. No. 16-CR-188** |
| **v.** | ) | |
| | ) | |
| **JAMES E. CARTWRIGHT,** | ) | |
| | ) | |
| **Defendant.** | ) | |

# UNITED STATES' MEMORANDUM IN AID OF SENTENCING

## I. INTRODUCTION

Public office is a public trust. The United States entrusted the Defendant, James E. Cartwright, a retired United States Marine Corps four-star general who served as the Vice Chairman of the Joints Chiefs of Staff, with some of its most sensitive and consequential classified information. That classified information, and the Defendant's obligation not to disclose it to individuals who were not authorized to receive it, remained with him after he retired from government service in September 2011. The Defendant violated this trust by: (1) leaking highly classified information to reporters on multiple occasions; (2) lying to the FBI in an effort to conceal his crimes; and (3) distributing another fabricated version of his conduct after the plea hearing, to falsely portray his crimes as acts of heroism.

On October 17, 2016, before this Court, the Defendant pled guilty to a felony offense and admitted to making unauthorized disclosures of TOP SECRET//SCI information to two individuals and to lying to the FBI about doing so, as described in the detailed Statement of Offense filed on October 14, 2016 ("Statement of Offense").

The United States recommends that the Court impose a sentence of 24 months of incarceration in this case. Such a sentence is sufficient but not greater than necessary to comply

with the purposes of sentencing set forth in 18 U.S.C. § 3553(a). The Defendant chose to violate the law in two distinct ways. First by providing and confirming TOP SECRET//SCI information to persons not authorized to receive it, and then by lying to the FBI as they conducted a criminal investigation into these unauthorized disclosures. The characteristics of the Defendant, specifically his extensive training in the proper handling of classified information, demonstrate that this was not a mistake or an error in judgment. Additionally, the need for deterrence is strong. Everyday across the United States Government, individuals are entrusted with highly sensitive classified information. They must understand that disclosing such information to persons not authorized to receive it has severe consequences. Finally, the Government's sentencing recommendation is within the spectrum of sentences imposed in recent cases involving the unauthorized disclosure of classified information and lying to federal investigators, and thus avoids unwarranted sentencing disparities.

## II. FACTUAL SUMMARY

In 2012, David Sanger published a book and an accompanying article that contained highly sensitive classified information. Within days of the article's publication, the Attorney General of the United States tasked the United States Attorney for the District of Maryland and the Federal Bureau of Investigation (FBI) with conducting a criminal investigation into the source of the unauthorized disclosures to Sanger.

In the course of that investigation, the FBI learned, and the Defendant has admitted, that he met with Sanger on two occasions, one in January and the other in March 2012, and that the Defendant "provided and confirmed classified information, including TOP SECRET//SCI information, to David Sanger," in the course of those meetings. Statement of Offense ¶ 10.

The FBI also learned, and the Defendant has also admitted, that in February 2012, he "confirmed classified information, including TOP SECRET//SCI information" to Daniel Klaidman, a second reporter. *Id*. at ¶12.

On November 2, 2012, the Defendant agreed to a voluntary interview with the FBI. During that interview, which lasted more than three hours, the Defendant repeatedly denied that he had disclosed or confirmed TOP SECRET//SCI information to either Sanger or Klaidman. Further, he offered the interviewing FBI agents a detailed, yet fabricated, version of events concerning his communications with Sanger and the two meetings they had in an attempt to deceive law enforcement into believing he was not the source of any of the classified information disclosed to Sanger. Similarly, the Defendant denied even discussing with Klaidman the subject matter of the article that Klaidman wrote that contained classified information, information that the Defendant now admits he confirmed before the article's publication. He made these denials precisely because he knew what he did was wrong and not because he believed he was "engaged in the well-known and understood practice of attempting to save national secrets," the version of events he now offers in mitigation of his criminal conduct. Attachment 1 (Statement from Gregory Craig).

When confronted with emails between himself and Sanger that demonstrated that the Defendant's version of events was indeed false, and with an email exchange with Klaidman in which the Defendant confirmed TOP SECRET//SCI information, the Defendant passed out and was taken to the hospital. The Defendant apparently had an attack of conscience and blacked out when the FBI confronted him with evidence that he had lied to them in the course of a voluntary interview in which he had agreed to participate. He spent the evening of Friday, November 2, 2012, at the hospital and was discharged the next day. He voluntarily resumed his FBI interview

on Monday, November 5, 2012. During that second interview, the Defendant admitted providing and confirming classified information to Sanger and Klaidman.

## III. UNITED STATES SENTENCING GUIDELINES CALCULATION

The advisory sentencing guidelines offense level in this case is eight, based on an offense level of six and an agreed-upon two-level enhancement for abuse of a position of trust. However, a two-level reduction would be appropriate for acceptance of responsibility, resulting in an offense level of six. Plea Agreement ¶ 4.

As the Statement of Offense makes clear, the Guideline calculation understates the seriousness of the offense. The Defendant admitted not only to lying to the FBI, but also to disclosing TOP SECRET//SCI information to two individuals not authorized to receive it. In the plea agreement, the parties agreed that "the Government reserves the right to seek a sentence above the Estimated Guidelines Range based on § 3553(a) factors." *Id*. at ¶ 5. Further, the parties agreed that, "[t]he Government and [the Defendant] reserve the right to describe fully, both orally and in writing, to the sentencing judge, the nature and seriousness of [the Defendant's] misconduct, including any misconduct not described in the charges to which [the Defendant] is pleading guilty. *Id*. at ¶ 6.

## IV. DEFENDANT'S CRIMINAL CONDUCT

### A. Applicable Law

Title 18, Section 3553, of the United States Code provides that, in determining a particular sentence, the Court should consider the nature and circumstances of the offense and the characteristics of the defendant. 18 U.S.C. § 3553(a)(1). In addition, it states that the Court must consider other factors, including the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law . . . . to provide just punishment for the offense, [and] to

afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(A) & (B). Further, the sentence should protect the public from further crimes of the defendant and provide the defendant with needed correctional treatment. 18 U.S.C. § 3553(a)(2)(C) & (D). Finally, the sentence should "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

### B. The Seriousness of the Offense

The criminal acts in this case, both the unauthorized disclosures of TOP SECRET//SCI information and the making of false statements to the FBI, are of grave significance. The former affects our nation's national security. The latter affects the ability of our criminal justice system to effectively investigate crimes and hold the individuals responsible accountable. The United States will address the seriousness of all the conduct to which the Defendant has admitted in the Statement of Offense.

#### 1. The Unauthorized Disclosures of TOP SECRET//SCI Information to Sanger and Klaidman

In the course of FBI's investigation in this case, the Defendant was identified as a likely source of the classified information that Sanger published. A United States Magistrate Judge in this court authorized a search warrant for the Defendant's personal email account, which revealed evidence that the Defendant made unauthorized disclosures of classified information to Sanger. Also contained in those emails was conclusive evidence that the Defendant made an unauthorized disclosure of classified information to Klaidman.

In the Statement of Offense, the Defendant admitted he made unauthorized disclosures of TOP SECRET//SCI information to both Sanger and Klaidman:

> Between January and June 2012, Cartwright provided and confirmed classified information, including TOP SECRET//SCI information, to David Sanger. David Sanger was a reporter for a national newspaper. David Sanger was not authorized

> to receive the classified information that Cartwright provided to him and confirmed to him. David Sanger included the classified information Cartwright communicated to him in an article that was published in the national newspaper for which he worked and in a book he authored.
>
> * * *
>
> In February 2012, Cartwright confirmed classified information, including TOP SECRET//SCI information, to another reporter, Daniel Klaidman. Daniel Klaidman was a reporter for a national news organization. Daniel Klaidman was not authorized to receive the classified information that Cartwright confirmed. Daniel Klaidman included the classified information Cartwright confirmed to him in an article that was published in the news magazine for which he worked.

Statement of Offense ¶¶ 10 and 12. Thus, there is no dispute that the Defendant made unauthorized disclosures of TOP SECRET//SCI information to two individuals who were not authorized to receive it. The substance of those disclosures is discussed in the Classified Addendum to this Memorandum.

The Defendant knew that the unauthorized disclosure of information that is classified as "TOP SECRET//SCI" reasonably could be expected to result in "exceptionally grave" damage to the national security of the United States. *See* Statement of Offense ¶ 4; *see also* Executive Order 13526. The "Classified Information Non-Disclosure Agreement" he signed when he retired from government service in September 2011, clearly stated: "I have been advised that unauthorized disclosure . . . by me could cause damage or irreparable injury to the United States or could be used to advantage by a foreign nation." Statement of Offense ¶ 11.

As a result, the Defendant's decision to provide and confirm TOP SECRET//SCI information to two individuals who, he admits, were not authorized to receive it and who he knew were likely to publish the information, was profoundly dangerous. He did so, as he ultimately admitted in his interview with the FBI, without authorization and without even

consulting anyone in the United States Government before or after he communicated with Sanger and Klaidman.

This was not a single episode. It was not a slip of the tongue when he "provided and confirmed" TOP SECRET//SCI information to Sanger and "confirmed" classified information to Klaidman or when he denied doing so to the FBI. These episodes were not momentary lapses in judgment or the product of mistake or any misunderstanding. The Defendant's criminal conduct spanned a ten-month period from January 2012, when he first made unauthorized disclosures to Sanger, to November 2012, when he lied to the FBI about the disclosures to Sanger and Klaidman.

The Defendant may argue that "confirming" information is not as serious as disclosing it in the first instance, although he admitted in the Statement of Offense to doing both. Such an argument overlooks the fact that confirmation is a form of disclosure. Moreover, the timeline is clear, as the Defendant has admitted—he provided and confirmed classified information for the reporters, who then published their articles. If Sanger and Klaidman had information they could have published without confirmation from the Defendant, they likely would have published that information without reaching out to him. However, they went to the Defendant before they published classified information, and the Defendant gave them the additional proof they needed to publish classified information.

Additionally, as the Defendant well knows, the classified information he provided and confirmed was extremely sensitive. In the statement issued to the press by the Defendant's counsel, the Defendant claims he sought to "prevent publication of information that might harm American lives or national security." Attachment 1 (Statement of Gregory Craig 10/17/2017).

Implicit in this statement is the Defendant's acknowledgement that the information the Defendant provided and confirmed for Sanger and Klaidman could harm the United States.

**2. The Defendant Lied to the FBI About the Unauthorized Disclosures of TOP SECRET//SCI Information He Made to Sanger and Klaidman**

In his FBI interview on November 2, 2012, the Defendant repeatedly lied to the FBI in an effort to conceal his involvement in the unauthorized disclosures the FBI was investigating. As described in the Statement of Offense:

> On November 2, 2012, Cartwright agreed to a voluntary interview with agents of the Federal Bureau of Investigation (FBI). In that interview, Cartwright intentionally provided false information to the interviewing agents, including, among others, the following false statements:
>
> a. After investigators showed Cartwright a list of quotes and statements from David Sanger's book, a number of which contained classified information, Cartwright falsely told investigators that he was not the source of any of the quotes and statements. Cartwright also falsely told investigators that he did not provide or confirm classified information to David Sanger.
>
> b. Cartwright falsely told investigators that he never discussed Country 1 with Daniel Klaidman when in truth Cartwright had confirmed certain classified information relating to Country 1 in an email he sent to Daniel Klaidman.
>
> The false statements Cartwright made to the FBI were material and were made knowingly and willfully.

Statement of Offense ¶¶ 13-14.

The Defendant not only denied that he had provided TOP SECRET//SCI information to Sanger, he also gave the FBI a fabricated story about his interactions with Sanger. The following information is drawn from the FBI report of the Defendant's interview on November 2, 2012, which is being provided to the Court as an attachment to the United States' classified addendum to this memorandum. According to the FBI's report, the Defendant described his interactions with Sanger as the following:

> Outside of Aspen [a reference to conferences convened by the Aspen Institute on a variety of topics] and other casual "run-ins" with Sanger, Cartwright met Sanger in person on two occasions in his office at CSIS [the Center for Strategic and International Studies].
>
> Sanger contacted Cartwright's office via a telephone call to Cartwright's research assistant, Scott Goossens, and mentioned that he wanted to interview Cartwright in regards to information pertaining to Cyber Command (CYBERCOM). According to Cartwright, Goossens scheduled the interview and put "CYBERCOM" as the topic of the interview in Cartwright's calendar.
>
> The first time Sanger came to CSIS to meet him, Cartwright was under the impression the meeting was for an article Sanger was writing about CYBERCOM. Sanger eluded to wanting to talk to him about cyber for something he was writing. Cartwright thought he was initially meeting Sanger to provide context for an article. However, shortly after the interview started, Sanger started asking questions that were clearly geared toward a book he was writing on . . . Sanger and Cartwright met for approximately 15-20 minutes.

Attachment 1 to Classified Addendum, November 2, 2012 Interview of James Cartwright at 2-3. Prior to this interview, the FBI had obtained emails between the Defendant and Sanger that showed that their initial meeting was not arranged by Scott Goossens and was not for the purpose of discussing CYBERCOM. Rather, the meeting was arranged between the Defendant and Sanger directly, and the topic was clearly identified as pertaining to classified information. The Defendant then falsely told the FBI that he refused to answer Sanger's questions because doing so would confirm classified information. The FBI's report further states that the Defendant told the FBI:

> Cartwright agreed to meet Sanger again in Cartwright's CSIS office a few weeks following their initial meeting. During this second meeting, Sanger told Cartwright he had been to the White House and "worked off their concerns." Sanger again asked Cartwright to provide him with information for his book and to address any concerns Cartwright may additionally have in regards to the material. Cartwright refused and explained to Sanger that he did not feel comfortable consulting for his book because he was no longer in government.
>
> Sanger brought a satchel to his second meeting with Cartwright. The satchel contained at least three or four paper-clipped groupings of paper, which Cartwright believed contained pieces of Sanger's manuscript. Although it was

> clear Sanger wanted Cartwright to look over some of the manuscript, Cartwright refused to even look at the papers.

*Id.* at 4. Thus, Sanger represented at least to the Defendant that he was speaking with current officials in the United States Government to, "work[] off their concerns," about the material Sanger was intending to publish. This fact contradicts the Defendant's assertion that he believed he had to engage in a freelance unauthorized "save the secrets" exercise with Sanger. Sanger also gave the Defendant an opportunity to address any concerns he himself had and the Defendant told the FBI he refused to do so.

The FBI then showed the Defendant a list of 37 passages from Sanger's book. The Defendant reviewed each passage carefully and had a detailed discussion about the information contained in those passages with the FBI agents as if he was trying to assist them in their investigation. He then denied providing any of the information in those passages to Sanger. He did this all the while knowing he was engaging in deception. He offered the FBI the names of other current and former government officials who, he claimed, might have had access to the classified information contained in the passages in Sanger's book in an attempt to direct attention away from himself and onto others. *See id.* at 6-13.

The FBI then returned to the topic of how the Defendant came to meet with Sanger and what occurred in those meetings. Again, the Defendant chose to lie to the FBI about his interactions with Sanger. According to the FBI's report, the Defendant told the FBI the following:

> In regards to the first meeting with Sanger, Cartwright was not sure if Sanger mentioned []. Sanger wanted to know how CYBERCOM was organized. Cartwright suggested that he would have discussed with Sanger the difference in the Obama and Bush Administration's cyber programs, but Sanger did not.

> The second of the two meetings between Sanger and Cartwright was very short, and ended after Cartwright refused to review the portions of the manuscript Sanger attempted to show.
>
> Cartwright stated he never discussed [Country A] [] [with] any with reporters or responded to questions concerning [].

*Id.*at 14.

The FBI then questioned the Defendant about Klaidman. *Id.* at 14. He was shown an article written by Klaidman. *Id.* The Defendant told the FBI he was not familiar with the article. *Id.* He further told the FBI that he had not discussed the topic of the article with Klaidman. *Id.* In fact, the article included text that the Defendant had seen in an email from Klaidman that contained classified information and the Defendant had confirmed this information to Klaidman via email. *Id.*

The FBI then showed the Defendant the email exchange he had with Klaidman concerning the article that contained classified information. *Id.* at 14-15. The FBI also showed the Defendant his email to Klaidman in which the Defendant confirmed the classified information Klaidman had emailed to him. The report of the interview describes the following:

> After reading the email exchange, Cartwright stated the email contradicted his previous statements concerning not engaging with Klaidman on matters pertaining to []. Cartwright explained that he did not recall Klaidman asking about the matter, but then stated, **"I think I divulged classified information."** He additionally took off his glasses, started rubbing his eyes, and told interviewing agents, "**you got me**" when confronted with his contradicting statements.

*Id.* at 15 (emphasis added).

The FBI then returned to the topic of David Sanger and showed the Defendant an email in which Sanger had reached out directly to the Defendant to set up their first meeting, which contradicted the Defendant's previous statement that Sanger had reached out to the Defendant's

assistant Scott Goossens, and described the topic that Sanger wanted to discuss, which was not CYBERCOM, as the Defendant had previously told the FBI. *Id*. At this point in the interview:

> Cartwright read through the email and scanned the document with his finger. Cartwright was shaking, losing color in his face, and clearing his throat. Cartwright attempted to explain the email; however, his speech became slurred and he subsequently slumped over in this chair and lost consciousness.
>
> Interviewing agents immediately attended to Cartwright and contacted FBI Police and FBI medics for assistance.

*Id*. at 15-16. The Defendant was then transported from the FBI office to an area hospital.

After being discharged from the hospital over the weekend, the Defendant voluntarily returned to the FBI office on Monday, November 5, 2012. He was again shown the email exchange he had with Klaidman. That email exchange is Attachment 4 to the Classified Addendum submitted with this sentencing memorandum. The Defendant admitted that he was the military source quoted in Klaidman's article. Attachment 2 to Classified Addendum, November 5, 2012 Interview of James Cartwright at 2. The article did not identify the Defendant by name. The Defendant admitted to the FBI that, "he did wrong by validating something he had no intent of validating to a reporter." *Id.*

The FBI returned to the Defendant's communications with Sanger. The Defendant then admitted to the FBI that he provided and confirmed a variety of classified information to Sanger and detailed that information to the FBI. *Id*. at 3-10. The FBI reviewed the list of 37 passages that they had shown the Defendant on Friday, November 2, 2012, and the Defendant, on his own initiative, began marking the passages with a series of color highlighters provided to him by the FBI—in yellow, for information that the Defendant provided to Sanger; in green, "for text on paper that Sanger showed to Cartwright which Cartwright subsequently confirmed"; and in blue, for "information Sanger verbally discussed with Cartwright and Cartwright may have confirmed,

but Sanger did not show him in writing." The Defendant initialed each page of the highlighted list of passages and signed and dated the last page. *See* Attachment 3 to Classified Addendum.

**3. The Defendant's Statements to the Press After His Guilty Plea and His Statement to the United States Probation Officer**

The Defendant has submitted a statement to the United States Probation Office in this case asserting that in making unauthorized disclosures of TOP SECRET//SCI information he was motivated by a desire, to "talk them [referring to Sanger and Klaidman] out of using classified information that, if published, would do damage to U.S. national security." Presentence Report ¶ 30. The Defendant may attempt to offer this explanation as a mitigating factor for the Court to consider at sentencing. This story is at odds with the facts in this case and should be disregarded.

In the course of its investigation, the United States found no evidence that any other United States government official disclosed classified information to Sanger or Klaidman, other than the Defendant, and no evidence that the Defendant was engaged in a "save the secrets" exercise as he now claims. While the Defendant asserts that Sanger and Klaidman were in possession of some classified information when they approached him, there is no evidence to support that claim, other than the Defendant's word.

At the time he entered a plea of guilty on October 17, 2016, the Defendant and his lawyers released two statements to the press. The statement released by his counsel said the following:

> General Cartwright has spent his whole life putting the national interest first.
>
> That's why he talked to the reporters in the first place – to protect American interests and lives in a story they had already written. In his conversations with these two reporters, General Cartwright was engaged in a well-known and understood practice of attempting to save national secrets, not disclosing classified information. His effort to prevent publication of information that might harm American lives or national security does not constitute a violation of any law.

> General Cartwright's offense was in statements he made to FBI agents investigating a leak – and that is the entire basis for his plea.

Attachment 1 (Statement from Gregory Craig 10/17/2016). Counsel's press statement is inaccurate in three respects. First, Counsel's statement that the Defendant "talked to the reporters," about "a story they had already written," is contradicted by the facts the Defendant admitted to in the Statement of Offense. In the Statement of Offense, the Defendant admitted that, "David Sanger included the classified information Cartwright communicated to him in an article that was published in the national newspaper for which he worked and in a book he authored." Statement of Offense ¶ 10. Sanger, therefore, could not have written the article, which included information Cartwright provided to him, before his meeting with Cartwright. Second, Counsel's statement that when the Defendant made unauthorized disclosures to Sanger and Klaidman he, ". . . was engaged in a well-known and understood practice of attempting to save national secrets, **not disclosing classified information**," (emphasis added) is also contradicted by the Statement of Offense, to which his client agreed. The Statement of Offense provides that, "[b]etween January and June 2012, Cartwright provided and confirmed classified information, including TOP SECRET//SCI, to David Sanger." *Id*. Third, Counsel's statement that "General Cartwright's offense was in statements he made to FBI agents investigating a leak – and that is the entire basis for his plea," is also contradicted by the Statement of Offense. In the Statement of Offense, the Defendant admitted to, first, "providing and confirming" TOP SECRET//SCI information to Sanger and "confirming" TOP SECRET//SCI information for Klaidman, and, second, to lying to the FBI about his conduct. *Id*. ¶¶ 10 and 12. All of that conduct forms the basis for his plea and all of that conduct should be considered by the Court in

arriving at a sentence that is sufficient, but not greater than necessary, as articulated in 18 U.S.C. § 3553.

The Defendant also released a statement to the press on the day he pled guilty. In it he said, “I knew I was not the source of the story and I didn’t want to be blamed for the leak. My only goal in talking to the reporters was to protect American interests and lives”. Attachment 2 (Statement of James E. Cartwright 10/17/2016).

This recent explanation for lying to the FBI, that he “did not want to be blamed for the leak,” is inconsistent with his behavior during his interviews with the FBI. If he had engaged in a freelance, unauthorized “save the secrets” exercise with these two reporters, then explaining that to the FBI at the time of his interviews would have been his best argument for why he should not be “blamed for the leak.” An innocent person would have offered the explanation he now offers when the FBI first approached him; indeed, it would have been the first thing an innocent person likely would have said. If the Defendant had, in fact, tried to “save the secrets,” he would have had no reason to lie to the FBI.

In two days of interviews with the FBI on November 2 and 5, 2012, the Defendant never once offered this explanation for making the unauthorized disclosures. He never told the FBI either on November 2, 2012, when he lied about his contacts with Sanger and Klaidman and then admitted to the disclosures, nor on November 5, 2012, when he described in greater detail the information he disclosed to them, that he did so to, “talk them out of using classified information that, if published, would do damage to U.S. national security.”

Indeed, the topic of “saving the secrets” specifically came up during his first FBI interview. On November 2, 2012, the FBI’s report of the interview states:

> Cartwright acknowledged that the typical way to handle a matter where a compromise is acknowledged or observed is to report back to the originating

> /victim agency the nature of the compromise so that it can be assessed and investigated through the proper channels.
>
> Cartwright did not contact anybody at the Department of Defense or White House following his discussions with Sanger, because he was "unsure of what the Administrations' thoughts were" on the matter.

Attachment 1 to Classified Addendum November 2, 2012 Interview of James Cartwright at 5. Rather than telling the FBI that he "was engaged in a well-known and understood practice of attempting to save national secrets," as he has recently claimed, he specifically told the FBI he had not engaged in such an exercise.

Additionally, while the Defendant asserts he sought to "protect American interests and lives," he admitted to the FBI in his interview that he did not contact anyone in the United States Government after speaking with David Sanger. If he had learned that Sanger had information that could cost American lives, or otherwise compromise American interests, how could he have not reached out to responsible Government officials? The fact that he did not reveals the truth – this was not a "save the secrets" exercise.

To the extent there is, "a well-known and understood practice of attempting to save national secrets," as the Defendant's counsel asserted in his statement to the media, it bears no resemblance to what the Defendant now claims he did. Attempts to "save the secrets" are conducted by government officials acting with authorization to do so. They are not conducted by retired government officials who do so without any authorization and without even consulting responsible persons in government. In the trial of *United States v. Sterling*, former Secretary of State and National Security Advisor Condoleezza Rice testified about such an effort. According to the sentencing memorandum filed by the United States in that case:

> [Dr. Rice] testified that on April 30, 2003, she met with representatives of The New York Times at the White House, "for the express purpose of requesting that the newspaper stand down from running an article James Risen had written concerning Classified Program No. 1 . . . ." And so, at the April 30, 2013 White House meeting, Dr. Rice conveyed her deep concerns to representatives from the Times, including Mr. Risen, that any article about Classified Program No. 1 would endanger lives and national security by compromising one of the most important, closely held, and sensitive intelligence operations of her entire tenure as National Security Advisor.

Attachment 3 (United States Memorandum in Aid of Sentencing, *United States v. Jeffrey Alexander Sterling*, No. 1:10c4485 (docket number 464, filed 04/2015)). That episode reflects the "well-known and understood practice of attempting to save national secrets." Dr. Rice was then serving as National Security Advisor to President George W. Bush. The meeting she convened was held at the White House and was authorized at the highest levels of the United States government. The Defendant, by his own admission, had no authorization to speak to Sanger and Klaidman about classified information. He did so on his own accord, in his office at the Center for Strategic and International Studies, and, worst of all, without ever notifying anyone in the United States Government concerning the information he claims both reporters already had when they came to him.

As a former government official, the Defendant's duty when approached by Sanger was to remain silent and report the unauthorized disclosure to the Department of Defense, which then held the Defendant's security clearance. On the day he retired, the Defendant signed an agreement, discussed in more detail below, in which he expressly promised to do those two things. The relevant portion of that agreement contains the following language:

> 3. I understand that **it is my responsibility to consult** with appropriate management authorities in the department or agency that last authorized my access to SAPI, whether or not I am still employed or associated with that Department of Agency. . . **I**

> **further understand that I am obligated by law and regulation not to disclose any classified information or material in an unauthorized fashion**.

Statement of Offense at ¶ 8 (emphasis added).

For the reasons discussed above, the Defendant's assertion that he was "saving the secrets" is not credible. The closest the Defendant came to admitting his true motivation when he was interviewed by the FBI was when he told them he got "hooked" on talking to reporters. Attachment 2 to Classified Addendum, November 5, 2012, Interview of James Cartwright, at 10.

The United States submits that a more likely motivation than "saving the secrets" was to give information to reporters that provided favorable portrayals of the Defendant in the books and articles they wrote. Government officials funneling information to reporters that portray them in favorable ways is not uncommon. As described in the Classified Addendum, the Defendant was featured prominently and positively in Sanger's book and article and in Klaidman's article.

**4. Characteristics of the Defendant**

As the Vice Chairman of the Joint Chiefs of Staff, and prior to that as the Commander of the United States Strategic Command (STRATCOM) from 2004 to 2007, Cartwright signed more than 36 non-disclosure agreements in which he promised to never disclose classified information to persons unauthorized to receive it under any circumstances. Statement of Offense ¶ 6. Cartwright also received annual training on the proper handling and the safeguarding of classified information as Vice Chairman. *Id*.

As the Defendant knew, and as described in the Statement of Offense:

> Those persons with security clearances granting them access to classified information are prohibited by Title 18, United States Code, Section 793, and

> applicable rules, regulations, and orders, from disclosing classified information to persons not authorized to receive such information. Classified information may only be shared with persons determined by an appropriate United States government official to be eligible for access to classified information, who had signed an approved non-disclosure agreement, and who possessed a need to know.

Statement of Offense ¶ 5.

In fact, prior to his first meeting with Sanger and his communications with Klaidman, on September 1, 2011, Cartwright executed a Debriefing Acknowledgment on a Special Access Program Indoctrination (SAPI) Agreement. SAPI Agreements are legally binding agreements between an individual being granted, or already in possession, of a security clearance, and the United States Government where the individual agrees to never disclose classified information without first receiving appropriate authorization. Among other things, the SAPI Agreement states:

> 6. I have been advised that **any breach of this agreement may constitute violations of United States criminal laws,** including the provisions of Sections 793, 794, 798, and 592, Title 18 United States Code, and of Section 783, Title 50, United States Code. Nothing in this agreement constitutes a waiver by the United States of **the right to prosecute me for any statutory violation**.

*Id.* at ¶ 8 (emphasis added). The Defendant signed this agreement less than six months before he began making unauthorized disclosures to Sanger and Klaidman.

Similarly, on March 2, 2012, after his first meeting with Sanger but before his second, Cartwright signed another "Classified Information Non-Disclosure Agreement." That Agreement included the following warnings, among others:

> 1. Intending to be legally bound, I hereby accept the obligations contained in this Agreement in consideration of my being granted access to classified information . . . . I understand and accept that by being granted access to classified information, **special confidence and trust shall be placed in me by the United States government**.

> **3. I have been advised that unauthorized disclosure . . . by me could cause damage or irreparable injury to the United States or could be used to advantage by a foreign nation.**
>
> **4.** . . . . I have been advised that any unauthorized disclosure of classified information by me may constitute a violation or violations of United States **criminal laws** including, provisions of Sections 641, 793 . . .

*Id.* at ¶ 11 (emphasis added).

When Cartwright retired from the United States Marine Corps he maintained a TOP SECRET security clearance. This TOP SECRET security clearance enabled CARTWRIGHT to engage in consulting and private employment for financial gain. *See id.* at ¶ 9. The Defendant joined the Board of Directors of Raytheon, and, as a result of the fact that he then possessed a TOP SECRET//SCI security clearance, sat on the Special Activities Committee of the Board, which oversees Raytheon's classified contracts. He served on Raytheon's Board from 2012 until 2016. As of April 2016, Raytheon valued the total compensation the Defendant had received from his service on the company's board at $363,950. *See* Attachment 4 (excerpts of Raytheon Company's Proxy Statements for 2012-2016). He resigned from the Raytheon Board only five days before he pled guilty. *See* Attachment 5 (Raytheon Form 8-K). Thus, the Defendant benefited financially from the trust placed in him by the United States while at the same time violating that trust by making unauthorized disclosure of TOP SECRET information.

**5. The Need for Deterrence**

The Defendant's felony guilty conviction should prevent him from holding a security clearance in the future but the need for general deterrence remains. According to the Office of the Director of National Intelligence, as of October 12, 2012, some 791,200 United States government employees held TOP SECRET security clearances. *See* Attachment 6 (ODNI

Report on Security Clearance Determinations January 2013). Every day the holders of these TOP SECRET security clearances are trusted with highly classified information, the unauthorized disclosure of which can put American interests and lives at risk. Monitoring those individuals for unauthorized disclosures is a costly and administratively burdensome process. The Department of Defense alone has spent millions of dollars developing a program over ten years to monitor individual security clearance holders for unauthorized disclosures. *See* Attachment 7 ("Feds to Scrutinize Security Clearances After Leaks," TIME Mar. 10, 2014). One indication of the seriousness of unauthorized disclosure as a workforce issue in the U.S. Intelligence Community was an announcement by the Director of National Intelligence in response to the leaks that gave rise to this and another FBI investigation:

> **Director Clapper Announces Steps to Deter and Detect Unauthorized Disclosures**
>
> Director of National Intelligence James R. Clapper announced today two immediate steps to help protect critical national security information from unauthorized disclosures.
>
> To better protect sensitive information, and help deter and detect potential leakers within the Intelligence Community, Clapper is:
>
> (1) mandating that a question related to unauthorized disclosure of classified information be added to the counterintelligence polygraph used by all intelligence agencies that administer the examination CIA, DIA, DOE, FBI, NGA, NRO, and NSA).
>
> (2) requesting the Intelligence Community Inspector General lead independent investigations of selected unauthorized disclosure cases when prosecution is declined by the Department of Justice. The IC IG will establish and lead a task force of IC inspectors general to conduct independent investigations, pursuant to his statutory authority and in coordination with the Office of the National [C]ounterintelligence Executive. This will ensure that selected unauthorized disclosure cases suitable for administrative investigations are not closed prematurely.
>
> "These efforts will reinforce our professional values by sending a strong message that intelligence personnel always have, and always will, hold ourselves to the

> highest standard of professionalism," said Clapper. "It is my sincere hope that others across the government will follow our lead. It is the right thing to do on behalf of the American people and in the interest of our national security."
>
> "All IC leaders are reinforcing this same message and fully cooperating as we take steps to address this critically important issue, which has profound implications for current and future intelligence capabilities and our nation's security," said Clapper.

Attachment 8 (ODNI News Release No. 9-12).

When an individual is found to have made unauthorized disclosures, particularly one serving in a senior position in government, it is critically important to hold that individual accountable in order to deter others throughout the federal workforce from engaging in such conduct.

The Government and the Defendant chose to resolve this case through a guilty plea, rather than a public trial. Each national security case is unique. Each comes with its own intelligence equities and the potential for harm if those equities are exposed in a public trial. As the district court noted at sentencing in the *United States v. Kiriakou*:

> I recognize the difficulty the government has in prosecuting these types of cases. They have to balance the potential danger of disclosure of very sensitive information when deciding how to proceed, and in balancing those concerns, they came up with this plea.

*Kiriakou*, Sentencing Transcript at 20-21 (January 25, 2003). Both sides have benefited from this plea. The Defendant avoided indictment and potential conviction on charges of violating 18 U.S.C. § 793(d). The Government avoided the potential damage that further disclosure of classified information at trial might cause. However, individuals who expose our nation's most highly classified information, like the Defendant, should not receive the most lenient sentences, merely because their cases are the subject of negotiated pleas rather than public trials.

### 6. Avoiding Unwarranted Sentencing Disparities

Cases involving the unauthorized disclosure of classified information are rare. *See United States v. Kim*, 808 F. Supp. 2d 44, 55 (D.D.C. 2011) (observing that the "most likely" reasons for a "dearth of prosecutions" under Section 793(d) are the "difficulty in establishing such a violation, combined with the sensitive nature of classified information and the procedures that must be followed in using such information in a trial"). There are only five recent prosecutions of individuals involving the unauthorized disclosure of classified information to which to compare this case. These cases can be arrayed along a spectrum. At one end of the spectrum, in *United States v. Petraeus*, Cr. No. 3:15, prosecuted in the Western District of North Carolina, the court sentenced the Defendant, on a joint recommendation from the parties, to two years of probation and a $100,000 fine, which exceeded the parties' recommendation, following a plea to a misdemeanor charge of unauthorized retention and removal of classified information in violation of 18 U.S.C. § 1924. At the other end of the spectrum, in *United States v. Sachtleben*, Cr. No. 13-0200, prosecuted in the Southern District of Indiana, the court sentenced the Defendant to 43 months' incarceration for unauthorized transmission of national defense information in violation of 18 U.S.C. § 793(d). Both of these cases were the result of guilty pleas by the defendants. A sentence similar to the sentence imposed in *Sachtleben* was imposed in *United States v. Sterling*, Cr. No. 10-485, prosecuted in the Eastern District of Virginia. In that case, the court sentenced the defendant to 42 months' incarceration following a trial and conviction on nine counts including the unauthorized transmission and retention of national defense information, in violation of 18 U.S.C. § 793(d) and (e), unlawful conveyance of government property, in violation of 18 U.S.C. § 641, and obstruction of justice, in violation of 18 U.S.C. § 1512(c)(1). In *United States v. Kiriakou*, Cr. No. 12-127, prosecuted in the Eastern

District of Virginia, the court imposed a sentence of 30 months' incarceration following a guilty plea to one count of intentionally disclosing information identifying a covert agent, in violation of 50 U.S.C. § 421(a). In *United States v. Kim*, prosecuted in this district, the court, pursuant to a Federal Rule of Criminal Procedure Rule 11(c)(1)(C) plea agreement, sentenced the defendant to 13 months' incarceration following a guilty plea to one count of unauthorized transmission of national defense information, in violation of 18 U.S.C. § 793(d).

The sentence recommended by the United States in this case, 24 months' incarceration, lies in the middle of this spectrum of sentences in cases involving the unauthorized disclosure of classified information and making false statements. Two facts distinguish the Defendant's case from Petraeus's case, which lies at one extreme. First, the *Petraeus* case did not involve the disclosure of any classified information to the public. Without authorization, Petraeus had given his biographer – who possessed a security clearance – access to classified information, and he improperly stored classified information at his residence. None of this classified information was included in his biography or made public in any other way. By contrast, the Defendant has admitted to "provid[ing] and confirm[ing] TOP SECRET//SCI information to David Sanger and has acknowledged that Sanger, "included the classified information Cartwright communicated to him in an article that was published in the national newspaper for which he worked and in a book he authored." Statement of Offense ¶ 10. The Defendant has also admitted to "confirm[ing] TOP SECERET information to Daniel Klaidman and has acknowledged that "Daniel Klaidman included the classified information Cartwright confirmed to him in an article that was published in the news magazine for which he worked." Statement of Offense ¶ 12. Second, the information that Petraeus disclosed was historical information from his tenure as Commander of the International Security Assistance Force in Afghanistan from 2010 to 2011. By contrast, the

information that the Defendant disclosed concerned ongoing classified matters, a fact he acknowledges by arguing that he made disclosures to, "prevent publication of information that might harm American lives or national security."

## V. CONCLUSION

The Defendant served in the uniformed military for 38 years and became the second highest ranking officer in the United States. He is also the most senior government official to ever plead guilty to a felony in connection with the unauthorized disclosure of classified information. In imposing a sentence, the Court is presented with the task of reconciling both facts. The Defendant's years of service to the United States should not be disregarded because he engaged in criminal conduct. At the same time, that criminal conduct should not be excused because of his prior service. The United States submits that a sentence of 24 months' incarceration strikes the appropriate balance between the Defendant's prior military service and his offense conduct, is and what he did and is sufficient but not greater than necessary to comply with the purposes of sentencing.

Respectfully submitted,

ROD J. ROSENSTEIN
United States Attorney for the District of Maryland
Special Attorney to the Attorney General

By: ______________________
Leo J. Wise
Assistant United States Attorney
Special Attorney to the Attorney General

Elizabeth Cannon
Trial Attorney
National Security Division

CERTIFICATE OF SERVICE

On this 10th day of January, 2017, a copy of the foregoing was served on counsel of record for the defendant via the Court's Electronic Filings System.

By: Leo J. Wise

Leo J. Wise
Assistant United States Attorney
Special Attorney to the Attorney General